Filed 2/24/23  In re Z.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Z.S. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.W. et al.,<br><br>Defendants and Appellants. | F085012<br><br>(Super. Ct. Nos. JVDP-20-000137, JVDP-20-000138 & JVDP-20-000139)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Appellant, L.W.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant, Zachary S.

Thomas E. Boze, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

L.W. (mother) and Zachary S. (father) appeal from the juvenile court's order terminating their parental rights as to their three minor children (Welf. & Inst. Code,[1] § 366.26.)  They appeal separately,[2] both arguing the juvenile court erred by declining to apply the beneficial parent-child relationship exception to the termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)).  Mother, joined by father, additionally argues the juvenile court erred by declining to apply the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)).  Finally, both parents argue the court erred by finding the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) was inapplicable because the juvenile court and the Stanislaus County Community Services Agency (agency) failed to comply with the initial inquiry provisions of ICWA and related California law.  The agency concedes the ICWA findings were erroneous and that remand is appropriate to ensure ICWA inquiry compliance.

We conditionally reverse the juvenile court's findings that ICWA does not apply and remand for proceedings to ensure ICWA compliance.  In all other respects, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 16, 2020, the agency filed a dependency petition on behalf of then three-year-old Z.S., then two-year-old M.S., and then eight-month-old I.S.  The agency alleged that the children came within the jurisdiction of the court under section 300, subdivision (b)(1).  It was alleged the children had suffered or were at substantial risk of suffering serious physical harm or illness due to the parents' failure or inability to protect the children and substance abuse.  In support of the allegations, the petition asserted that

---

[1]    All further undesignated statutory references are to the Welfare and Institutions Code.

[2]    Each parent joins in the other's arguments on appeal.  When we refer to an argument being asserted by one party in this opinion, we are referring to the brief where that argument is detailed.

2.

on June 26, 2020, law enforcement had responded to the family's residence at a motel where mother reported father had punched her in the eye, hit her in the face with a 15-pound backpack, and pulled out some of her hair. Both parents had been drinking, and all three children were present for the incident. Mother had visible bruising and reported this was the third domestic violence incident between her and father. Father had fled before law enforcement could contact him. Mother had a history of substance abuse, including testing positive for THC and cocaine at delivery of M.S. and THC and alcohol at delivery of I.S. As a result of the latter incident, the parents had received Voluntary Family Maintenance (VFM). On January 27, 2020, during the VFM case, mother tested positive for THC, alcohol, and methamphetamine. The case was closed due to the parents' lack of participation and engagement and "being on the run and in hiding for over 2 months."[3]

On July 15, 2020, mother executed a "PARENTAL NOTIFICATION OF INDIAN STATUS" (ICWA-020) form indicating she had no Indian ancestry as far as she knew. Father executed an ICWA-020 form indicating he had no Indian ancestry as far as he knew on July 17, 2020.

At the detention hearing on July 17, 2020, both parents appeared. The court acknowledged receiving the parents' ICWA-020 forms. Father's attorney indicated father "does not know but has had indications from his mother, the paternal grandmother, that there may in fact be Indian ancestry" and that "Cherokee was mentioned." Counsel for the agency asked the court to make a finding ICWA did not apply "unless the father comes up with more specific information." The court addressed father, who informed the court he did not have any further information. The court responded, "No. That is certainly not enough information for us to identify these children or even to make further

---

[3] The agency also alleged the children came within the court's jurisdiction under section 300, subdivision (g) as father's whereabouts were unknown. However, the court struck these allegations at the detention hearing as father appeared.

investigations" and instructed father to let the court know "if you get more information or any member of your family has more information." The social worker asked the court if it was "going to make a finding of no ICWA?" to which the court responded, "I am finding then that there's no indication that any of these children are Indian children, and therefore no notice needs to be given." The court made no inquiry on the record of mother regarding the children's possible statuses as Indian children. At the conclusion of the hearing, the court ordered the children detained from the parents.

Following the children's detention it was observed that they adjusted appropriately to placement and appeared happy. M.S. and I.S. had diagnoses of sickle cell anemia since birth and were required to attend various medical appointments. In August 2020, both parents were admitted into residential substance abuse treatment facilities.

At the jurisdiction hearing on August 26, 2020, the parties submitted the matter on the agency's reports. The court found the allegations of the petition true and that the children came within its jurisdiction under section 300, subdivision (b)(1). The matter was continued for a disposition hearing.

At the disposition hearing on August 28, 2020, the court adjudged the children dependents of the court, removed them from the physical custody of the parents, and ordered the parents to receive family reunification services, including individual counseling, domestic violence counseling, couples counseling when the clinicians deemed appropriate, parenting education, and substance abuse counseling and testing.

Both parents engaged in their services. In October 2020, mother tested positive for alcohol and initially resisted going back to treatment but was ultimately readmitted about 10 days after her positive test, reengaged in services, and was reported to do well.

The agency attached copious visitation reports to its reports submitted throughout the proceedings. From detention to the six-month status report dated February 3, 2021, the visitation reports documented happy and positive visits. From the first visitations in July 2020 until January 2021, the parents visited the children separately through a

4.

combination of video and in-person visits. In both visits with mother and father, the children consistently appeared happy and excited to see each parent. Mother's primary focus in earlier visits was getting the children to engage in academic activities. She would have the children do color and number flashcards and quiz them. At times, she was stern with the children when they lost interest in such activities. As visits progressed, mother engaged the children in other ways, doing various activities with the children, such as playing peek-a-boo with them, reading them books, making animal noises with them, and coloring. In the visits, father was frequently silly with the children, making them laugh. He often read to them, which the children seemed to enjoy.

In January 2021, the parents began visiting the children together. During their first visit as a family, the parents focused on educational interaction, and it was observed that mother appeared to be controlling with father, with mother correcting or directing father, while, according to the visitation monitor, father's behavior was appropriate. Mother informed the visitation monitor that she wanted the children to remain on the couch the entire visit and engage in her educational efforts. In subsequent family visits, the parents were observed to take turns engaging with all of the children and presented as positive and encouraging.

In the individual visits, Z.S. often asked for the parent who was not present. Z.S. was frequently reported to get sad at the ends of visits with both parents separately, particularly with father, as well as family visits.

In early March 2021, mother gave birth to K.S., who was temporarily detained from mother, and dependency proceedings were initiated in a separate case. K.S. was ordered to be returned to mother's care at the detention hearing for that case.

At the six-month status review hearing on March 12, 2021, the court ordered that reunification services continue and granted social worker discretion for a trial visit in the home of either parent when deemed appropriate.

In the reporting period between the six-month and 12-month status review hearings, the parents continued to engage with their services. Mother was reported as "making great progress." It was noted, however, that mother appeared to "enable [father] by managing his money and attempting to resolve" transportation issues and other issues that arose while the children were in his care. The parents had not had the opportunity to engage in couples counseling, as their domestic violence clinicians had not assessed them to do so. Father maintained sobriety but was reported as having issues with residence staff as he "presented frustrated, entitled and not willing to receive feedback from house staff" and had to be moved twice "due to his attitude." It was further reported that father relied on mother "to resolve his problems and … appears not interested in learning … how to care for the children."

Visitation logs from the review period between the six-month and 12-month status review hearings reflected more happy interactions, with the children being happy to see the parents, and the parents playing various games and activities with the children. Mother included K.S. in video visits with the children and brought her to visits at the visitation center.

In May 2021, the children began having community visits with the parents individually in their respective treatment residences, starting with one-hour weekly visits. In June 2021, the parents progressed to three-hour weekly visits, and in July 2021, they progressed to day-long weekly visits. The agency noted in its 12-month status review report it increased visits for mother because no concerns were reported but "the reports were not detailed." As to father, the agency noted with regard to his day-long visits that he "appeared to not know how to engage the children in fun, kid friendly activities for a long period."

The children were doing well in their placement. During home visits, the social worker observed the children generally to appear happy. I.S., particularly, appeared

6.

attached to the caregiver. In July 2021, Z.S. reported he liked visiting with his parents but loves that he is also happy with the caregiver.

At the 12-month status review hearing on August 19, 2021, the court ordered the children to continue as dependents of the court and continued reunification services for the parents, with the social worker continuing to have discretion to start overnight visits leading to trial visits once deemed appropriate.

In October 2021, the children began having overnight visits with each parent at their respective residences.

In the agency's 18-month status review report dated December 22, 2021, the recommendation was to restore the custody of the children to the parents and provide the parents with family maintenance services. The agency planned to start trial visits with the parents on December 31, 2021, with mother having the children Monday through Friday, and father having the children Friday through Sunday. Reports prepared by a parent partner were attached to the report. The parent partner observed the children playing and having fun with each parent.

On the date set for the 18-month review hearing on January 10, 2022, counsel for the agency requested the matter be trailed because of "new information … that requires further investigation and assessment." The court trailed the matter.

The agency prepared an addendum report dated January 19, 2022, which reflected it changed its recommendation to termination of reunification services for both parents. In late December 2021, mother had provided two positive drug tests for alcohol and one for methamphetamine. Mother initially denied using alcohol but eventually admitted that she had. Mother consistently denied using methamphetamine. It was also reported mother had chosen to discontinue prescribed medication to help curb alcohol cravings, depression, and anxiety without consulting her physician. The agency opined the children could not return to either parent safely based on mother's circumstances, as well

7.

as father's failure to make progress in codependency with mother and concerns with him being able to parent the children safely without mother's assistance.

Visits returned to the visitation center, and the agency provided the visitation logs from these visits. It was reported that in visits with father, the children laughed, played, and roughhoused. One of father's visit had to be ended early because the visit became unsafe due to father's struggle with supervising all the children adequately. During one visit, mother was reported as being positive and interactive with the children, but it was observed that she did not start conversations with the children nor ask many questions of them. At this visit, M.S. presented as sad and said that she wanted "daddy."

During a home visit in January 2022, the caregiver reported that Z.S. and M.S. were upset when they were not able to return to mother's care as originally planned. The caregiver noticed behavioral issues at first with defiance and tantrums, but they had settled back into normal behaviors. The caregiver further reported that Z.S. had shared with her he did not want to go with father, only mother. During this home visit, the social worker observed Z.S. approach the caregiver and sit on her lap while he watched TV. Z.S. did not want to talk to the social worker, but M.S. happily showed the social worker her doll.

A contested 18-month review hearing commenced on March 10, 2022, with evidence being taken over the course of several days. The court delivered its ruling on May 6, 2022. In ruling, the court noted that despite receiving services, mother still struggled to maintain her sobriety, was unable to identify specific triggers, and was not honest with regard to her relapse, delivering different versions of her drinking pattern and not disclosing her relapse until testing revealed it. The court concluded the evidence demonstrated mother was in denial about the seriousness of her alcohol addiction. The court was also concerned about evidence that mother had failed to consistently take her prescribed medications. The court noted father had clearly demonstrated a commitment to sobriety but the court was concerned about his attitude towards his providers. The

court noted the record demonstrated the agency had bias against father with regard to his attitude and that father "would have no success in turning around firmly-fixed opinions about his attitude with the Agency" as evidenced by "[c]omments in the service logs by social workers and [a provider that] were some what unprofessional." The court went on to say, however, there was evidence of "a clear problem with [father's] attitude," in the early stages of the case, which caused him to have to move residences twice. His house manager, however, had testified that father's attitude was better now. The court concluded father had not convinced the court the children would be safe in his custody without assistance.

In determining whether extended reunification services should be provided, the court could not conclude the children could be safely returned within 24 months, which would have been 10 weeks away from the ruling. The court terminated the parents' reunification services and set a section 366.26 hearing.[4]

Both parents filed notices of intent to file writ petitions. Mother's case was dismissed for failure to file a petition in *L.W. v. Superior Court* (F084363). Father, however, filed a petition for extraordinary writ in *Zachary S. v. Superior Court* (F084362), arguing (1) the juvenile court erred by finding substantial risk of detriment if the children were returned to father or, alternatively, (2) by failing to set a 24-month review, and (3) the court erred by finding reasonable reunification services had been provided. This court issued a written opinion denying the petition and affirming all the juvenile court's findings and orders.

After reunification services were terminated, the parents' visits with the children were reduced to once per month. During father's May 2022 visit, he was observed to focus more on K.S. than the other children and to yell "sharply" at I.S. and put him on

---

[4] The 18-month status review hearing coincided with a section 387 hearing in K.S.'s case. The court sustained the section 387 petition, found substantial danger if K.S. were to be returned home, and continued the matter for disposition.

"too many timeouts." Father and the children played together and, at one point during the visit, Z.S. went to father for a hug, and father said, "I love you too, son." During mother's May 2022 visit, the children and mother greeted each other with warm embraces. Mother engaged in conversation with the children and played a card game with them. At the end of the visit, M.S. and I.S. ran toward the caregiver. During the June 2022 visit, the family played together, but mother "often had to direct [f]ather on what to do" with the children, and father was observed to "excessively" discipline I.S. At the end of the visit, M.S. said she would miss the parents, and she and Z.S. walked back to hug them multiple times before eventually leaving. At the July 2022 visit, the parents played with and did several activities with the children such as reading, playing with a ball, and painting. The parents held the children in their laps, and the children and parents hugged affectionately. The family danced together and laughed and smiled. In the August 2022 visit, father read a book to the children and the children played with toys. Z.S. was observed hugging father. At the September 2022 visit, the children were excited to see the parents, and during the visit the family played together and appeared happy. At the end of the visit, the family exchanged hugs and "I love yous." Z.S. stated he did not want to leave.

Following termination of reunification services, the children continued to do well in placement. In June 2022, the caregiver reported the children were all "great kids." She reported she had no concerns with Z.S. and described him as "responsible, helpful, and kind," that M.S. had become less shy and was very smart, and that I.S. had some trouble eating but was very active and "constantly on the go or busy bugging his siblings." The social worker observed the children appeared to be happy and would frequently go to their caregiver for comfort. Z.S. reported he visited with his parents but that sometimes father was "mean" to I.S. In July 2022, the caregiver reported I.S. was eating better. M.S. showed the social worker the dress she was wearing and her bow collection. Z.S. reported to the social worker that visits with his parents were "ok" and

that he likes going. When he spoke about his caregiver, he smiled and said that the caregiver is good to them. Z.S. reported he enjoyed school and playing with his friends. In August 2022, Z.S. showed the social worker his room and reported he was excited to go back to school. M.S. reported she too was happy to go back to school and that she likes visiting her parents but sometimes did not feel like going. I.S. was reported to have a lot of energy.

The agency's section 366.26 report dated August 17, 2022, recommended that parental rights be terminated and adoption with their current caregivers be selected as the children's permanent plan. The children's caregiver had been caring for them since January 2021 and was "certain" to adopt the children.

The agency filed an addendum report dated September 14, 2022, which addressed the parents' relationship with the children. In the report, the social worker stated both parents had "failed to demonstrate a strong, beneficial relationship with their children." The social worker noted father appeared to struggle with the children and that it appeared I.S. "often appears distracted during the visits with minimal engagement with" father. The social worker further noted father struggled to remember his children's diaper sizes and details about the services they received. As for mother, the social worker noted mother had struggled to maintain her sobriety. Finally, the social worker stated the children never returned home during the case and had received stability from their caretaker and had been out of the parents' care for significant portions of their lives. It was observed "there continues to be concerns about the parents' ability to comfort and care for the physical and emotional needs of the children as demonstrated by the visitation reports and prior reporting of parents' actions over this dependency." The social worker opined severing the parent-child relationship would not cause the children emotional harm and that "there is not a substantial, positive, emotional attachment from the children" to either parent.

11.

At the contested section 366.26 hearing held on September 19, 2022, neither the agency nor counsel for the minors presented any evidence. Counsel for mother recited the following offer of proof on behalf of mother:

> "If … mother were called to testify, she would testify as follows:
>
> "She loves her children very much and feels that there is a mutual strong bond between herself and her children. She has maintained regular visitation throughout the life of the case. During visits, all three children seem excited to see her. All three children run up and hug her and say 'mommy' when they see her. She knows each child individually. She recognizes her mistakes and feels the children would suffer without her in their life.
>
> "Prior to termination of her reunification services for these three children, she had overnight visits with all four—and all four children were present. The three older children devoted much of their attention to their baby sister. She feels that her three older children should not be separated from [K.S.]"

Counsel for father recited the following offer of proof on behalf of father:

> "If the father were called to testify, he would state that he has consistently—[¶] … [¶] … attended all of his visits with the children. The children are happy and excited to see him when they have their visits. The children hug him at visits and call him dad. He has a relationship with each minor and knows what each minor likes to watch for movies or toys they like to play with. He has lived with the minors prior to removal and had them for overnight visits. When they left one visit they didn't want to leave, saying 'daddy, daddy.' The father loves his children and wants to have the opportunity to be in their life."

Counsel for the agency submitted on the recommendation to terminate parental rights as to both parents and establish a permanent plan of adoption. Counsel for the minors argued the court should follow the agency's recommendation. Counsel for mother argued the court should not terminate parental rights under the beneficial parent-child relationship and sibling relationship exceptions. Counsel for father argued the same.

In ruling, the court noted the case was "heartbreaking on so many levels" and that it must be confusing for the parents to have reunification continue with K.S. but face having parental rights terminated as to their other three children. The court told the parents its "heart goes out to [the parents] because it is clear that the visits with the children are positive, everybody enjoys the visits, and it seems like the mother helps redirect the father when he can use some extra support during the visits, and it certainly seems like the children really, really enjoy the visits with the parents." The court went on to say that "positive, playful visits are not all that it takes, and that's a big problem."

The court continued by saying, "if I had my druthers, I would go ahead and order a legal guardianship over an adoption, but the statute says that the Court has to consider adoption as the first goal" and "can't just choose whichever one I would wish … [because] I do have to follow the law." The court again noted the case was "super heartbreaking." The court went on to say the parents "most certainly have regularly and consistently visited. [¶] But the other prong, talking about detriment, is that there has to be evidence of a substantial positive and emotional attachment between the children and the parents. And I don't agree that it has to be expert testimony, but I do agree that that positive, substantial, emotional attachment has to be found in this case, and unfortunately, I cannot find that the parents have met that burden. So the Court just cannot find that the parent beneficial child exception to adoption exists in this particular case."

As for the sibling relationship exception, the court stated, "it seems like the three older children definitely know who their sister is, they know her and she knows them by their faces and that, but I don't have any evidence of there being a similar experience with [K.S.] living with their siblings and having spent much time with them other than at visits."

The court concluded its reasoning by stating: "And it also is concerning that to me, these are young children, [a]nd [M.S.] and [I.S.] are both medically fragile and VMRC clients, and that [I.S.] still struggles with eating. He requires a lot of time,

13.

patience, and understanding in doing that. But the children have been in placement with this particular foster home since January 29, 2021, which is pretty close to 20 months. So a big portion—not all of [Z.S.]'s certainly, but a big portion of the children's lives have been spent out of the home of the parents."

The court concluded the parents failed to meet their burden to prove the beneficial parent-child relationship and sibling relationship exceptions to termination of parental rights and ordered adoption as the children's permanent plan and terminated parental rights.

Apart from having the parents fill out ICWA-020 forms and the discussion of father's claim that his mother told him he had Cherokee ancestry at the detention hearing, the agency and the court made no further ICWA inquiry efforts. The agency reported in every report that ICWA did not apply, citing the court's July 17, 2020 finding, and the court made a finding ICWA did not apply at every hearing.

## DISCUSSION

I.  **Beneficial Parent-Child Relationship Exception to Termination of Parental Rights**

Both parents argue the court erred by declining to apply the beneficial parent-child relationship exception to terminating parental rights. We disagree.[5]

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining

---

[5]     We address the parents' separate arguments regarding the beneficial parent-child relationship exception together because there is much overlap in the facts and analysis. In analyzing both parent's claims, however, we considered the evidence of each individual child's relationship with each individual parent.

that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The California Supreme Court has relatively recently clarified in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) that there are three elements a parent has the burden to prove by a preponderance of the evidence to justify the application of the beneficial parent-child relationship exception: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id*. at pp. 632–633, 636–637.)

We review the first two elements—whether the parents regularly and consistently visited and whether a beneficial relationship exists—for substantial evidence and the third element—whether "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home"—for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 639–641.) Under the substantial evidence standard of review, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court

has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)[6]

There is no dispute that the court's finding the parents regularly and consistently visited was supported by substantial evidence. We therefore focus our discussion on the second and third elements, which the court found the parents had not met their burden to prove.[7] We conclude the court's findings were supported by substantial evidence and its ultimate determination was not an abuse of discretion.

In determining the second element, the court may consider factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) In determining the third element, courts look at "whether it would be harmful to the child to sever the relationship and choose adoption." (*Id.* at p. 633.) Courts must "determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the

---

[6] The *Caden C.* court explained " 'there likely will be no practical difference in application of the two standards,' " but "[a]t its core, the hybrid standard we now endorse simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

[7] The juvenile court referred to the "other prong" (besides regular and consistent visitation) as the element "talking about detriment" and went on to state it did not find the parents had met their burden to show a substantial, positive, emotional attachment. The agency interprets the court's comments as the court "conflat[ing] into one finding what the Supreme Court divided into two findings in *Caden C.*" and we do as well. The juvenile court did not find the parents showed a substantial, positive, emotional attachment, and was therefore not required to move to the third element. By referring to detriment in its analysis, however, we find that the court implicitly found it would not be detrimental to sever the relationship when weighed against the benefit of an adoptive home.

16.

child in an adoptive home without the parent in the child's life…. [¶] … That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Ibid.*) Courts may consider whether the child will experience effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as well as how a "new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

Here, in making its ruling, the juvenile court stated it considered the August 18 and September 14, 2022 reports, which included visitation reports from May 2022 through September 2022. In addition to these reports, the juvenile court also had each parent's brief offer of proof to consider. This evidence before the juvenile court established that the parents and children enjoyed positive visits with each other and were affectionate and loving toward each other, and that the children, particularly Z.S. and M.S., were sad to leave visits. Even if we were to agree with the parents that the evidence established the children had a substantial, positive, emotional attachment to the parents, we cannot say the juvenile court abused its discretion by concluding that terminating the relationship would not be detrimental to the children when weighed against the permanence and stability of an adoptive home.

We note that though the parents bore the burden to establish the application of the exception, neither parent offered any additional evidence beyond their offers of proof—they did not testify; they did not call anyone who monitored any visits, or the clinician who facilitated the parent-child labs, or any other person who had knowledge of their relationship with the children to testify; and they did not request a bonding study. They did not even ask the court to consider any evidence from the previously submitted visitation reports. In short, they offered little evidence to supplement the reports and did

17.

not offer any evidence demonstrating what harm the children would suffer if parental rights were terminated. In contrast, the record demonstrated the children were doing well and were happy in their placement. Z.S. and M.S. generally presented as sociable to the social worker during home visits and enjoyed and were excited about school, and I.S. appeared to be bonded with the caregiver. There was no evidence of the children experiencing substantial depression or anxiety; rather the children were all screened for mental health services, and it was determined no services were needed. Most notably, the children adjusted quickly to seeing the parents less frequently and continued to thrive.

Father's comparison of the present case to *In re A.L.* (2022) 73 Cal.App.5th 1131 (*A.L.*) is not helpful to his or mother's position but illustrative of our conclusion. In *A.L.*, the appellate court concluded the juvenile court's finding there existed a substantial, positive, and emotional attachment was supported by substantial evidence. Father draws favorable factual comparisons between the relationship in that case and his relationship with the children to support his position that we, too, should find a similar attachment existed in the present case. Notably, however, the juvenile court in *A.L.*, despite finding the evidence supported there existed a substantial, positive, and emotional attachment, concluded the father had not established the benefit of the relationship outweighed the benefit of an adoptive home. The minor in *A.L.* was three years old at removal and, at the time of the section 366.26 hearing, had been with her prospective adoptive parents for one and one-half years of her life. The juvenile court concluded the minor would suffer a loss but one she " 'would be able to adjust to.' " (*A.L.* at pp. 1137, 1149.) The appellate court concluded the juvenile court did not abuse its discretion in making that determination and affirmed the juvenile court's order terminating parental rights. (*Id.* at p. 1161.)

Here, like in *A.L.*, the children were very young at removal and M.S. and I.S. had spent most of their lives out of the parents' care, and Z.S. had spent about half of his life out of the parents' care. Also, like in *A.L.*, the evidence demonstrates that any loss the

18.

children would experience would be one they could adjust to, given the evidence of their doing well with the caregiver despite seeing the parents less frequently. The juvenile court's conclusion in the present case was reasonable and supported by the evidence.

We reject mother's claim that reversal is required because the juvenile court "may have relied on improper factors in determining the beneficial parent-child relationship exception did not apply." Mother contends the court erred because it "did not discuss any of the evidence before it, nor did it address the three part test for this exception articulated" in *Caden C.*

Mother's claim this was reversible error is without merit. Mother cites no authority, and we have found none, that the juvenile court, in finding the beneficial parent-child relationship exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception. (See *A.L.*, *supra*, 73 Cal.App.5th at p. 1156.) As the court stated in *A.L.*, "we infer from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental." (*Ibid.*) The *A.L.* court concluded "although a statement by the trial court of its findings (or reasons) for its decision is helpful in conducting appellate review, it was not a legal requirement in this instance." (*Ibid.*) Similarly, we do not find the juvenile court's ruling here to be insufficient. In addition, *Caden C.* was decided in May 2021, and the section 366.26 hearing took place in September 2022, meaning the juvenile court was presumably aware of and familiar with *Caden C.* for approximately a year and four months prior to the hearing in the present case, and made the relevant considerations in making its determination. (See *Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563 [we presume the trial court followed the law].)

19.

We also reject mother's claim that the social worker's section 366.26 reports were legally deficient. Mother states the social worker "failed to acknowledge or address the children's emotional connection to their mother," without citing any case law to support her assertion that this constituted legal error. We note mother did not object to the agency's reports below. We further note it is "not the agency's burden to disprove the existence of the beneficial relationship exception—the burden of proof on this issue [is] squarely on [the parent or proponent of an exception]." (*In re J.D.* (2021) 70 Cal.App.5th 833, 861.) While there is "tension in the case law concerning the extent to which the agency must address facts pertinent to the beneficial relationship exception in the section 366.26 report itself" (*ibid.*), in the present case, the agency provided copious visitation reports throughout the life of the case, including the relevant reports for the period leading up to the section 366.26 hearing, which provided objective information regarding the children's relationships with the parents.

In a similar vein, father refers to the comments the court made at the 18-month status review hearing regarding the agency's bias towards him many times throughout his briefing. It is unclear the legal effect he is suggesting these comments had on the section 366.26 hearing and/or the court's findings and orders made at the section 366.26 hearing.[8] This court acknowledges the juvenile court's comments made at the 18-month status review hearing and acknowledges there is evidence in the record supporting these comments. We read them, however, in the context of the court's ruling that, even acknowledging evidence of bias regarding father's "attitude," the court still concluded the children could not be safely returned to father's care. Father had the opportunity to, and did, challenge the court's findings and orders at the 18-month status review hearing via writ petition. We cannot say any bias on the part of the agency affected the decision of

---

[8] We note the judge who made the comments was not the judge who presided over the section 366.26 hearing.

20.

the judge who presided over the section 366.26 hearing. Father suggests no bias on the part of the judge who presided over the section 366.26 hearing, nor do we find evidence of any bias. To the contrary, the comments made by the section 366.26 hearing judge, that the case was "heartbreaking" and the court, from a personal perspective, would rather order a legal guardianship over adoption, indicate to us the judge was not affected by any bias on the part of the agency. Rather, the comments indicate the court overrode personal feelings to make a ruling it felt was legally compelled and correct. To the extent father is challenging the content of the agency's section 366.26 report, he, like mother, did not object below, and for the reasons we have stated, we do not find either parent has stated a viable claim that the report was the legally deficient.

For the aforementioned reasons, we conclude the court did not err by declining to apply the beneficial parent-child relationship exception.

## II. Sibling Relationship Exception

Mother contends the court erred by finding the sibling relationship exception to termination of parental rights did not apply. We disagree.

Another statutory exception to the termination of parental rights is the sibling relationship exception. Pursuant to this exception, the juvenile court may decide not to terminate parental rights when it finds "a compelling reason for determining that termination would be detrimental to the child" where "[t]here would be substantial interference with a child's sibling relationship." (§ 366.26, subd. (c)(1)(B)(v).) The court must "tak[e] into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid*.)

21.

The "purpose of [the sibling relationship] exception is to preserve long-standing sibling relationships that serve as 'anchors for dependent children whose lives are in turmoil.' " (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437.) The " 'strong language' " used by the Legislature to describe the sibling relationship exception creates a " 'heavy burden for the party opposing adoption.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) The bill's author wrote that use of the sibling relationship exception " 'will likely be rare,' " which has been interpreted to mean that "the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 950.) The issue of the parents' reunification efforts with an infant sibling is "completely irrelevant to not only the existence of a current sibling bond but also the minors' interests in the permanence of adoption." (*In re I.R.* (2014) 226 Cal.App.4th 201, 214.)

We review the court's factual findings for substantial evidence and its " 'weighing of competing interests' " for abuse of discretion. (*In re Isaiah S.*, *supra*, 5 Cal.App.5th at p. 438.)

We cannot say the court erred by concluding the sibling relationship exception did not apply. The record demonstrates the children would see K.S. during visitations and later lived with her starting in January 2022 when it appears she was placed with their caregiver. There is evidence the children had positive interactions with K.S., however, K.S. was only one and one-half years old at the time of the section 366.26 hearing. Like with the beneficial parent-child relationship exception, mother did not present adequate evidence that the children would suffer detriment that outweighed the benefit they would receive from adoption if their relationship with K.S. were to be lost. The children were in a stable placement where they were doing well with a caregiver who wished to adopt them. Mother contends that focusing too heavily on K.S.'s age could lead to an interpretation that "a beneficial sibling relationship could never occur between older children and an infant/toddler, and that is simply wrong." We do not intend our

conclusion in the present case to suggest that a beneficial relationship between older children and infant never exists, but it is true that it would be more difficult to prove that an older child's relationship with their infant sibling would demonstrate the kind of "significant common experiences" or bonds which would establish detriment in comparison to the stability and permanence the child would experience from being adopted. In the present case, the evidence did not establish the children would experience detriment that would outweigh the benefit of adoption.

We find no error.

### III. ICWA

Both parents argue the court erred by finding ICWA inapplicable to the proceedings because the agency and the court failed to adequately discharge their duty of inquiry. The agency concedes error and that remand to ensure ICWA compliance is appropriate. We accept the agency's concession.

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8.) In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child," the Indian custodian and the Indian child's tribe have the right to intervene (25 U.S.C. § 1911(c)), and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (*id*., § 1914; see § 224, subd. (e)).

An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

In California, the court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child." (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).) The child welfare department's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) "Under both ICWA and California law, ' "extended family member[s]" ' include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' " (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053; 25 U.S.C. § 1903(2); § 224.1, subd. (c).) Upon each party's first appearance in a dependency proceeding, the juvenile court must ask each participant "whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and "[o]rder the parent … to complete [an ICWA-020 form]" (Cal. Rules of Court, rule 5.481(a)(2)(C), italics omitted).

Before finding ICWA inapplicable, the juvenile court must make a finding that the agency conducted "proper and adequate further inquiry" and exercised "due diligence" in doing so and that there is no reason to know whether the child is an Indian child. (§ 224.2, subd. (i)(2).)

There is a split of authority among the Courts of Appeal regarding how to evaluate claims of ICWA inquiry error. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 611–618 (*K.H.*) [summarizing the varied approaches].) The California Supreme Court has granted review on the issue in *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted September 21, 2022, S275578. Recently, this court decided *K.H.*, which articulates the standards we will apply until the Supreme Court provides additional guidance in *Dezi C.*

24.

In *K.H.*, this court adopted the hybrid standard of review set forth by *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1004–1005 (*Ezequiel G.*). (*K.H.*, *supra*, 84 Cal.App.5th at pp. 600–601.) Under this standard, "[t]he first element [of a court's ICWA finding under section 224.2, subdivision (i)(2)]—whether there is reason to know whether the child is an Indian child—requires the juvenile court to determine, based on the evidence before it, whether any one of six statutory criteria [set forth in section 224.2, subdivision (d)] is met" and is a factual determination best reviewed for substantial evidence. (*Ezequiel G.*, at p. 1004.) "The second element—whether a 'proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted' " requires the court to " 'engage in a delicate balancing' " and should be reviewed for abuse of discretion. (*Ezequiel G.*, at pp. 1004–1005.)

Applying these standards to the present case, we conclude the court abused its discretion in impliedly finding the agency had exercised due diligence and performed an adequate inquiry and thus committed error by finding ICWA did not apply to the proceedings. Here, the agency failed to follow up on father's claim that his mother would have information about possible Cherokee ancestry and further failed to inquire of any extended relatives of either mother or father. This was inadequate under the inquiry statutes, and the court's ICWA findings were not supported by substantial evidence and constituted an abuse of discretion.

Finding error, we turn to the issue of prejudice and whether remand is warranted. In *K.H.*, this court explained that the standard of prejudice should be one informed by the California Supreme Court in *In re A.R.* (2021) 11 Cal.5th 234 (*A.R.*), which focuses on

*injury* rather than *outcome*.[9]  Our high court explained in *A.R* that a *Watson*[10] likelihood-of-success test is not always appropriate in determining harmlessness because it cannot always adequately measure the relevant harm.  (*A.R.*, at pp. 252–253.)  This court recognized that " 'ICWA compliance presents a unique situation' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 608), as it "is not directed at reaching, or protecting, a specific outcome on the merits" but aids the court in determining whether any tribes need to be called upon to make a determination as to whether the child is an Indian child and given the opportunity to intervene in the proceedings if they wish (*id.* at p. 609).  Thus, "for the purpose of assessing prejudice, the focus is on the missed opportunity to uncover relevant information necessary to make a reliable, informed determination concerning whether the child is or may be an Indian child."  (*Ibid.*)

We conclude the error here is not harmless.  The agency's failure to follow up on father's claim of Cherokee ancestry and the failure to make any effort to further fulfill its duty to inquire of extended family members despite having made contact with several constituted a missed opportunity to uncover information meaningful to the determination of whether the children were Indian children for the purposes of ICWA.  Remand is necessary.

## DISPOSITION

The juvenile court's finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the agency to comply with the inquiry and documentation provisions set forth in section 224.2, subdivision (b), and California Rules of Court, rule 5.481(a)(5).  If, after determining that

---

**9**　　In *A.R.*, the California Supreme Court held that in cases where an attorney has incompetently failed to file an appeal in termination of parental rights cases, "[t]o ascertain prejudice, we focus on whether the parent would have taken a timely appeal, without requiring the parent to shoulder the further burden of demonstrating the appeal was likely to be successful."  (*A.R.*, *supra*, 11 Cal.5th at pp. 252–253.)

**10**　　*People v. Watson* (1956) 46 Cal.2d 818.

26.

an adequate inquiry was made consistent with the reasoning in this opinion, the court finds that ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law.  If the court instead finds that ICWA does not apply, its ICWA finding shall be reinstated.  In all other respects, the court's order terminating parental rights is affirmed.


                                               DE SANTOS, J.

WE CONCUR:


PEÑA, Acting P. J.


SMITH, J.